[No. B015319. Second Dist., Div. Seven. Mar. 23, 1987.]

IRVING DAVID RUBIN et al., Plaintiffs and Appellants, v.
CITY OF LOS ANGELES et al., Defendants and Respondents.

562

564

**COUNSEL**

Paul L. Hoffman, Joan W. Howarth, Patricia Erickson, Hecht, Diamond & Greenfield and Roger Jon Diamond for Plaintiffs and Appellants.

James K. Hahn, City Attorney, Lewis N. Unger, Assistant City Attorney, and Linda K. Lefkowitz, Deputy City Attorney, for Defendants and Respondents.

OPINION

**THOMPSON, Acting P. J.**—This case presents an issue of first impression concerning the power of the trial court to create a nonstatutory, local state secrets privilege that functions as a special defense to bar or abate an action under Code of Civil Procedure section 597.[1]

For the reasons that follow, we shall find that the trial court improperly dismissed the action under Code of Civil Procedure section 597 on the basis of defendants' first affirmative defense of a nonstatutory local state secrets privilege. We shall conclude that the court's other rulings based upon the erroneous upholding of defendants' first affirmative defense—namely, the denial of plaintiffs' motion to compel answers to interrogatories and the granting of defendants' motion for a protective order against further discovery—were also improper. Accordingly, we shall reverse the judgment and remand the case for the trial court to reconsider plaintiffs' motion to compel responses to interrogatories.

The plaintiffs are the Jewish Defense League, Inc.[2] the Jewish Defense League (JDL),[3] and Irving David Rubin, an officer and west coast executive director of the JDL.

The defendants are the City of Los Angeles (City), Daryl Gates in his official capacity as the City's Chief of Police, the City's Board of Police Commissioners (the Board), the Los Angeles Police Department's (LAPD) Anti-Terrorist Division (ATD), and Larry Winston, an alleged LAPD Officer.

The plaintiffs filed a complaint against the City and others for an injunction, declaratory relief, and general and punitive damages, alleging that the JDL had been unlawfully disrupted and that their constitutional rights of

---

[1]Code of Civil Procedure section 597 provides for the separate trial of special defenses (such as the statute of limitations, a prior judgment, and another action pending upon the same cause of action), that if successful would bar or abate the action. It also provides for the separate trial of "any other defense not involving the merits of the plaintiff's cause of action but constituting a bar or ground of abatement to the prosecution thereof . . . ." (Code Civ. Proc., § 597.)

[2]According to the complaint, the Jewish Defense League, Inc., a New York corporation, was formed: " '[t]o combat anti-semitism in the public and private sectors of life in the United States of America; [¶] [t]o uphold and defend the Constitution of the United States of America; [¶] [t]o support all agencies of government charged with the responsibility of maintaining law and order; [¶] [t]o foster a sense of obligation by the individual to community, state and nation; [¶] [t]o safeguard and transmit to posterity the principles of justice, freedom and democracy.' "

[3]According to the complaint, the JDL is a chapter of the Jewish Defense League, Inc., and is an unincorporated California association.

privacy, freedom of association and freedom of speech had been violated by the unlawful activities of an undercover police officer who had infiltrated the JDL.

The defendants filed an answer that, for the most part, refused to admit or deny the allegations of the complaint on the basis of the first affirmative defense, which raised the state secrets privilege[4] and the conditional official information privilege (Evid. Code, § 1040, subd. (b)(2)).[5] According to the first affirmative defense, the litigation must be foreclosed in its entirety because the City cannot admit or deny the allegations of the complaint, or accede to discovery, or proceed to trial without compromising national, state and local security interests. Defendants also refused to respond to interrogatories on the basis of the first affirmative defense and the provisions of the California Public Records Act (Gov. Code, § 6250 et seq.).

Defendants successfully moved for dismissal and a protective order foreclosing discovery on the basis of the first affirmative defense. The procedure utilized by defendants to obtain the judgment was unique. The trial court, at defendants' urging, combined the bifurcated trial procedure for special defenses (Code Civ. Proc., § 597), with the in camera hearing procedure (Evid. Code, § 915, subd. (b))[6] for Evidence Code section 1040 privilege claims, to try defendants' first affirmative defense prior to a trial of plaintiffs' complaint.

The court rendered judgment for defendants on the basis of the first affirmative defense, stating: "The Court finds . . . by the overwhelming weight

---

[4]"It is now well established that the United States, by invoking its state secrets privilege, may block discovery in a lawsuit of any information that, if disclosed, would adversely affect national security." (*Ellsberg* v. *Mitchell* (D.C. Cir. 1983) 709 F.2d 51, 56 .)

[5]Evidence Code Section 1040, subdivision (b)(2), provides a conditional privilege for official information "when the court determines, in accordance with precise statutory standards, that disclosure is against the public interest. . . ." (*Shepherd* v. *Superior Court* (1976) 17 Cal.3d 107, 123 [130 Cal.Rptr. 257, 550 P.2d 161].)

[6]Evidence Code section 915, subdivision (b), provides that in civil trials, disclosure of information claimed to be privileged may not be required except when "a court is ruling on a claim of privilege under Article 9 (commencing with Section 1040) of Chapter 4 (official information and identity of informer) or under Section 1060 (trade secret) and is unable to do so without requiring disclosure of the information claimed to be privileged . . . ."

In those situations, Evidence Code section 915, subdivision (b), provides that "the court may require the person from whom disclosure is sought or the person authorized to claim the privilege, or both, to disclose the information in chambers out of the presence and hearing of all persons except the person authorized to claim the privilege and such other persons as the person authorized to claim the privilege is willing to have present. If the judge determines that the information is privileged, neither he nor any other person may ever disclose, without the consent of a person authorized to permit disclosure, what was disclosed in the course of the proceedings in chambers."

of the evidence that the maintenance of this litigation is contrary to the public interest and because it would necessitate disclosure of clearly privileged information and significantly compromise not only local but National and International law enforcement, the Court concludes that the individual interests [in] pursuing damages and injunctive relief are insignificant to that of the public interest."[7] Plaintiffs appeal from the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

Due to the unique procedural posture of this case, it is necessary to set forth its factual and procedural background in detail.

A. *The Complaint*

According to the complaint, Winston, in accordance with his duties as a member of the ATD, infiltrated the JDL under the fictitious identity of Joel Cohen. Cohen submitted a written membership application to the JDL on or about September 4, 1979. During the three and one-half years of his membership, Cohen became a close friend of Rubin's and played a major role in the circumcision ceremony of Rubin's son in 1981.

The complaint alleges that during Cohen's membership, he destroyed the reputation and effectiveness of the JDL, invaded its privacy and the privacy of Rubin, and violated the rights to freedom of speech and association, privacy and petition, protected by the First and Fourteenth Amendments to the United States Constitution, by doing the following: (1) publicly referring to a rabbi in racist terms for the purpose of creating the false impression that the JDL is a racist organization; (2) urging three JDL members to fire a .22 caliber rifle into an occupied residence and volunteering to drive the proposed participants to the residence (the act was never carried out); (3) unsuccessfully attempting to throw a brick through the window of a residence and then illegally breaking into the house to steal a powersaw; (4) attempting to provoke a violent confrontation at a demonstration between members of the JDL and Black supporters of a political candidate by shouting racial epithets at the supporters; (5) stating to Rubin that the JDL should bomb a political candidate's headquarters; (6) urging JDL members to risk arrest

---

[7]The court further stated: "The Court is satisfied that the potential abuses and possible misconduct of the Los Angeles Police Department and Anti-Terrorist Division of the Los Angeles Police Department are controlled by the Court through the Coalition Against Police Abuse cases and the Police Commission."

by remaining on the premises at a protest rally after being ordered to leave; (7) repeatedly advocating and encouraging JDL members to attack certain offices; (8) initiating fights with opponents of the JDL; (9) using marijuana in the presence of JDL members; and (10) making racist remarks against members of racial minorities.

The complaint seeks an injunction and declaratory relief against the defendants on the ground that Winston's conduct violated the guidelines approved in the settlement of a lawsuit entitled Coalition Against Police Abuse, et al., v. Board of Police Commissioners of the City of Los Angeles (Super. Ct. No. C 243458). The guidelines, entitled "Standards and Procedures for the Anti-Terrorist Division" (ATD Standards) state in part: "(j) The following guidelines set forth restrictions on acceptable conduct by undercover officers.

"(1) While maintaining a fictitious identity, an undercover officer shall not in connection with said investigation . . . .

". . . . . . . . . . . . . . . .

"(c) Assume a position as one who leads, directs, manages, or officiates over the direction or goals of an organization;

"(d) Cause dissension within an organization or incite unlawful activity by any individual or organization. . . ."

The complaint also seeks general and punitive damages for violation of the California Constitution and title 42, United States Code, section 1983, and seeks attorney's fees.

B. *The Answer*

Defendants removed the case to federal court on the basis of the federal question raised by the section 1983 claim. The case was remanded to state court after plaintiffs removed the section 1983 claim from the complaint.

Thereafter, the Los Angeles City Attorney filed an answer to the complaint on behalf of defendants City, Gates, the Board, and the ATD,[8] denying the allegations of misconduct, mainly on the basis of the first affirmative defense.

---

[8]The answer states that neither the Board nor the ATD are legal persons, but are constituent units of the City.

Defendants also refused to confirm or deny the existence of Winston on the basis of the first affirmative defense.[9] The first affirmative defense provides: "The City strongly believes that legitimate intelligence gathering activities concerning local, national and international security would be jeopardized by maintenance of this litigation. Due to the nature of the subject matter, the City can neither admit nor deny many of the allegations set forth in the complaint, nor can it proffer an affirmative defense without compromising legitimate security interests. Similarly, to protect those interests, the City cannot accede to discovery and the production of evidence which will inevitably ensue if the matter proceeds to trial. The City, therefore, invokes the state secrets and official information privileges to foreclose this litigation in its entirety."

Defendants' answer also set forth additional language contained in the ATD Standards omitted from plaintiffs' recitation in the complaint: " 'The above mentioned restrictions shall not apply only where the refusal to engage in the requested proscribed activities shall immediately endanger the safety of the undercover officer or jeopardize the fictitious identity of the officer . . . .' "

## C. *Plaintiffs' Interrogatories*

Plaintiffs propounded interrogatories to defendants concerning whether Winston filed an answer in this case, whether Winston is represented by the city attorney's office, whether Winston is an LAPD Officer and a member or past member of its public disorder intelligence division and/or ATD, and whether he conducted a surveillance of plaintiffs. The interrogatories also inquired as to whether defendants contend that plaintiffs are a violent organization justifying infiltration and surveillance by the LAPD and, if so, all facts upon which this contention is based. It further asks whether defendants ever infiltrated the JDL in the past and, if so, requests the details and the names of the police officers.

Defendants objected to the interrogatories on the basis of the first affirmative defense of the state secrets and the official information privilege (Evid.

---

[9]The defendants' motion to dismiss states: "The court can be assured, in any event, that if an LAPD officer named Larry Winston does exist, he has requested and has been granted representation by the Los Angeles City Attorney's Office."

The record is not clear as to whether Winston has been served with the complaint, and whether he has filed an answer. Monrow Mabon, an LAPD Officer assigned to the ATD and an authorized agent for service of process, states in his declaration that he "accepted a summons and complaint for the alleged Defendant Larry Winston" but that Mabon "did not then, nor . . . now, admit or deny that a Larry Winston exists or if he does exist, that he is a Police Officer for the City of Los Angeles."

Code, § 1040, subd. (b)(2)), and on the basis of the privileges contained in the California Public Records Act (Gov. Code, § 6250 et seq.).[10]

### D. Defendants' Motion to Dismiss and for Protective Order; Plaintiffs' Motion to Compel Discovery

Defendants filed a combined motion for a protective order against further discovery and motion to dismiss the complaint, on the basis of the first affirmative defense to the complaint. Defendants argued that the state secrets privilege and the official information privilege (Evid. Code, § 1040) protected the information sought in the interrogatories, and constituted an affirmative defense allowing for the dismissal of the entire action under Code of Civil Procedure section 597.

In support of its motion to dismiss based on the first affirmative defense, defendants submitted a public declaration by Gates asserting the state secrets privilege and the official information privilege (Evid. Code, § 1040) on behalf of the City.[11]

---

[10]Government Code section 6254 provides in part, that with one exception which is inapplicable here, nothing in "this chapter shall be construed to require disclosure of ... [¶] (f) Records of complaints to or investigations conducted by, or records of intelligence information or security procedures of, ... any state or local police agency, or any such investigatory or security files compiled by any state or local police agency ...."

[11]The declaration discusses terrorism in Los Angeles in a general fashion (e.g., terrorism constitutes a "substantial threat to local, national and international security"). It describes, again in a general fashion, the role of the ATD in investigating terrorist activities. It does not, however, specifically mention the names of any suspected terrorist groups nor does it describe any specific investigations of the ATD.

With respect to the impact of disclosure of secrets in this litigation, the declaration states: "Investigations would be irreparably harmed by disclosure of the investigative techniques of ATD, thus jeopardizing the investigative capacity of the Division in collateral inquiries. Recruitment of officers and informants would be compromised by informant disclosures, as would techniques of training and communication with informants. If confidentiality is breached, new sources would obviously be unwilling to cooperate in future investigations.

"Disclosure would jeopardize pending and future investigations with other intelligence agencies and operations. If it is disclosed that multi-agency task force operations have been utilized in an investigation, the agents and informants of each cooperating agency would also be placed at risk. Improper disclosure thus might reveal the extent to which a person or organization has become a target of various intelligence agencies and the priority such a target has received at the local, state, national, and international level.

"Improper disclosure would also reveal the extent to which intelligence agencies exchange information, thus compromising each agency involved.

"It is also well known that terrorist organizations frequently operate in more than one governmental jurisdiction. Thus, a single item of information, improperly disclosed, may be extrapolated to reveal the degree to which other local, national, and international intelligence agencies have investigated the organization. Indeed, terrorist individuals and groups have

Plaintiffs filed a motion to compel responses to their interrogatories, and also opposed the motions for dismissal and a protective order.

The trial court stayed discovery, and granted defendants' request under Code of Civil Procedure section 597 for a bifurcated trial of the first affirmative defense. The procedure used was, at defendants' urging, an in camera hearing pursuant to Evidence Code section 915, subdivision (b).[12]

At the in camera hearings, defendants presented the testimony of named and unnamed witnesses, and introduced sealed exhibits.[13] The only role

themselves cooperated in such 'multi-terrorist' communications, cooperating in their own counter-intelligence-gathering activities.

"The techniques and procedures of investigation utilized by ATD are in many respects identical to procedures used by other local, state, national and international intelligence agencies. Disclosure of the investigative techniques employed by any one organization would therefore compromise and frustrate the collection of intelligence by all such agencies.

"In the past, LAPD has cooperated in numerous multi-agency intelligence investigations within the City in furtherance of national security and peaceful international relations. Specific accomplishments of such cooperation include, but are not limited to:

"(1) Thwarting disruptions of appearances of foreign cultural groups;

"(2) Preventing illegal weapons sales and smuggling activities;

"(3) Thwarting assassination attempts on international, national, and local political figures;

"(4) Providing information regarding persons involved in terrorist activity in at least two other states, resulting in arrests and seizures of a quantity of high explosives;

"(5) Developing information leading to the arrest and conviction of the murderer of a foreign consulate official;

"(6) Infiltrating an international terrorist group, leading to arrests in two other countries;

"(7) Providing information regarding an international terrorist group, leading to conviction in federal court of several of the group's members on charges of murder and extortion;

"(8) Thwarting of bombing attempts against foreign nationals, couriers, and consulates in this and other states."

Gates's declaration concludes that after reading "a number of documents bearing upon this case and [discussing] this case thoroughly with responsible ATD personnel[,] I have satisfied myself that the absolute confidentiality sought by the defendants is truly in the local, state and national security interest. I therefore assert on behalf of the City the following privileges respecting the claims set forth by the plaintiffs: "(1) The state secrets privilege; and

"(2) The official information privilege."

[12]Prior to the in camera hearing, plaintiffs reinstated the section 1983 cause of action. The court sustained a demurrer with leave to amend on the ground that the complaint failed to allege that the defendants acted under color of state law. After plaintiffs amended their complaint accordingly, defendants again demurred. The court overruled the demurrer at the close of the in camera hearing. Defendants were granted 30 days to answer the first amended complaint, but the court ultimately entered an order deeming the original answer to be the answer to the amended complaint.

[13]Our discussion of what transpired at the hearings is limited to the facts disclosed in defendants' public designation of witnesses expected to be called to testify at the in camera hearings. In summary, the designation indicated that the following witnesses would testify about privileged matter including: (1) Richard Kensic, LAPD conspiracy section—suspected perpetrator(s) of the bombing of a church; (2) Gates—regarding ATD Standards; (3) Kent Norman, LAPD ATD—criminal history records of plaintiff Rubin; (4) William Moran, Board member —audit of the ATD; and (5) Louis Mizell, Office of Security, United States Department of State—international implications of domestic terrorist activity, with emphasis on the JDL. Defendants also advised the court and plaintiffs that they would submit a videotape of a television broadcast of the "60 Minutes" program entitled "Hired Gun," and also a sealed affidavit of James Lyons, Special Agent, Federal Bureau of Investigation.

allowed to plaintiffs, which plaintiffs declined, was to provide the court with a list of questions to ask the witnesses, to sit outside the courtroom during the hearings, and to present evidence of their need for the privileged information.

At the close of the in camera hearings, the court heard oral argument by counsel for both plaintiffs and defendants. Plaintiffs, who were of course uninformed of what had transpired at the in camera hearings, urged the court to overrule the privileges, or to at least consider alternative procedures short of dismissal to protect the disclosure of information that the court may find to be privileged. In order to avoid the threatened dismissal, plaintiffs offered to limit discovery, and to even proceed to trial without conducting any discovery at all.

The court, however, dismissed the action, stating that it would not be reasonable to conduct a part in camera and part public trial because "[s]uch a trial could not allow proper examination of witnesses, since the mere asking of a question on examination or cross-examination could well reveal the secrets which are at stake."

The court indicated that it was basing its decision on federal law: "The City now asks for judgment without there being a trial of the plaintiffs' claims of wrongdoing. This is a highly unusual and unprecedented request under California decisional law, although the request is not unprecedented under federal law. Since the confidentiality of federal agencies' information is involved in this matter, I have no difficulty in considering and applying federal law on the subject."

The court, in granting judgment for defendants, stated: "I have thought a great deal on this matter over now many months and examined the issues carefully and considered all the evidence. Even were plaintiffs' claims to be true, I find by the overwhelming weight of the evidence that the maintenance of this litigation is contrary to the public interest because it would necessitate disclosure of clearly privileged information and significantly compromise not only local but national and international law enforcement.

"I have balanced the interests here and concluded that the individual interests here in pursuing an action for damages and injunctive relief [are] insignificant in light of the public interest in the maintenance of confidentiality.

"I'm satisfied that potential abuses here in this case, potential abuses and possible misconduct by the Los Angeles Police Department and the

Anti-Terrorist Division of the Los Angeles Police Department, are amp ly controlled by the court in the Coalition Against Police Abuse case and the Police Commission.

"No court in this state would ever consider this drastic remedy were there not good cause to do so. There's no question, from the history of past abuse by intelligence organs of our government, that oversight and control by an independent agency is necessary. But such oversight and control cannot take place, under the particular circumstances of this case, through the device of a civil lawsuit and, at the same time, maintain the public's overriding interest that information that is and ought to be confidential be kept confidential."

The court denied the motion to compel answers to interrogatories, granted the motion for a protective order, and entered judgment for defendants based on their first affirmative defense.

II

DISCUSSION

We determine that there is no basis under federal or state law to dismiss this action and therefore conclude that the trial court abused its discretion in granting defendants' motion to dismiss under Code of Civil Procedure section 597.

A. *The Inapplicability of Code of Civil Procedure Section 597*

Defendants contend that Code of Civil Procedure section 597 provided the "appropriate statutory vehicle for implementing the in camera procedures afforded by [Evidence Code section] 915 to adjudicate the City's request for dismissal pursuant to [Evidence Code section] 1040." The issue of first impression before us is whether defendants' first affirmative defense properly constitutes a special defense "not involving the merits of the plaintiff's cause of action but constituting a bar or ground of abatement to the prosecution thereof . . . ." (Code Civ. Proc., § 597.)

" 'It has long been held that special defenses which abate or bar the claim of the plaintiff may be tried before other issues, for a decision in the defendant's favor may render unnecessary the effort and expense of a complete trial.' [Citations.]" (*Cohn* v. *Bugas* (1974) 42 Cal.App.3d 381, 389 [116 Cal.Rptr. 810].) Code of Civil Procedure section 597 standardized this

procedure when it was enacted in 1939; it did not create a new practice. (*Booth* v. *Bond* (1942) 56 Cal.App.2d 153, 156-157 [132 P.2d 520].)

Code of Civil Procedure section 597 provides in pertinent part that when the answer "sets up any other defense[14] not involving the merits of the plaintiff's cause of action but constituting a bar or ground of abatement to the prosecution thereof, the court may, either upon its own motion or upon the motion of any party, proceed to the trial of the special defense or defenses before the trial of any other issue in the case, and if the decision of the court, or the verdict of the jury, upon any special defense so tried (other than the defense of another action pending) is in favor of the defendant pleading the same, judgment for the defendant shall thereupon be entered and no trial of other issues in the action shall be had unless that judgment shall be reversed on appeal or otherwise set aside or vacated . . . ."

The California Legislature has mandated that evidentiary privileges exist only if provided for by statute. (Evid. Code, § 911.)[15] ██ ██ The official information privilege (Evid. Code, § 1040), which is the " 'exclusive means by which a public entity may assert a claim of governmental privilege based on the necessity for secrecy' " (*Shepherd* v. *Superior Court, supra,* 17 Cal.3d at p. 123), has never before been found to function as a special defense that bars or abates an action under Code of Civil Procedure section 597.

The parties have cited no case, nor have we found one through our own research, wherein an evidentiary privilege was recognized to be a special defense under Code of Civil Procedure section 597. While defendants cite to dicta in the case of *Mayes* v. *Sturdy Northern Sales, Inc.* (1979) 91 Cal.App.3d 69, 79 [154 Cal.Rptr. 43], the passage that "[p]rivilege is an affirmative defense that must be pleaded and proved," does not refer to evidentiary privileges. It refers to the "privilege of one who has a financial interest in the business of another" (*id.,* at p. 78) in the context of tort liability for intentional interference with a contract.

As justification for the dismissal under Code of Civil Procedure section 597, defendants contend that the official information privilege of Evidence Code section 1040 provides an implicit dismissal mechanism that is derived,

---

[14]The enumerated special defenses in section 597 are the statute of limitations, prior judgment, and another action pending upon the same cause of action.

[15]Evidence Code section 911 states: "Except as otherwise provided by statute: [¶] (a) No person has a privilege to refuse to be a witness. [¶] (b) No person has a privilege to refuse to disclose any matter or to refuse to produce any writing, object, or other thing. [¶] (c) No person has a privilege that another shall not be a witness or shall not disclose any matter or shall not produce any writing, object, or other thing."

by analogy, from a line of federal cases involving the federal state secrets privilege, wherein complaints were dismissed for national security reasons. (See, e.g., *Totten* v. *United States* (1875) 92 U.S. 105 [23 L.Ed. 605]; *Salisbury* v. *United States* (D.C. Cir. 1982) 690 F.2d 966; *Sigler* v. *LeVan* (D.Md. 1980) 485 F.Supp. 185 [collectively, the *Totten* line of cases].)[16] Accordingly, the trial court created a new privilege that utilized the balancing test of the conditional official information privilege (Evid. Code, § 1040, subd. (b)(2)), and the dismissal remedy of the *Totten* line of cases. But before we discuss the application of *Totten* and its progeny herein, we shall first place those decisions in their proper context.

## B. *The Inapplicability of the State Secrets Privilege*

Although the City asked for the invocation of the state secrets privilege, we determine that it was improperly invoked and thus was not applicable to this case.

### 1. *Nature and General Applicability of the State Secrets Privilege*

██ The state secrets privilege is a federal privilege that has been used to protect military or state secrets, although until the second half of this century the privilege applied only to military matters. (*National Lawyers Guild* v. *Attorney General* (S.D.N.Y. 1982) 96 F.R.D. 390, 401.) "It is now well established that the United States, by invoking its state secrets privilege, may block discovery in a lawsuit of any information that, if disclosed, would adversely affect national security." (*Ellsberg* v. *Mitchell, supra,* 709 F.2d at p. 56.) The various secrets for which protection has been given, include those

---

[16]The reason defendants are limited to claiming the federal state secrets privilege applies only by *analogy* herein is that the privilege belongs solely to the federal government. Moreover, while the federal government may intervene in suits to assert the federal state secrets privilege, the successful assertion of the privilege does not necessarily result in dismissal. One federal court has stated that the effect of the federal government's successful invocation of the state secrets privilege, "when the government is not itself a party to the suit in question, is well established: '[T]he result is simply that the evidence is unavailable, as though a witness had died, and the case will proceed accordingly, with no consequences save those resulting from the loss of the evidence.' [Fn. omitted.]" (*Ellsberg* v. *Mitchell, supra,* 709 F.2d at p. 64.)

Defendants explain in their respondents' brief on appeal that the trial court "did not strictly apply the absolute state secrets privilege afforded under federal law, but rather, utilized, by analogy, the reasoning provided by the federal courts in addressing the state secrets privilege to recognize that a lower level of government, such as the City, possesses its own 'state secrets' of like magnitude and deserving of like protection. This local 'state secrets' privilege arises where, as here, it is so clearly required in furtherance of the public interest." Defendants' attorney further explained in oral argument before this Court, that: "The court was applying, I believe, the [federal] state secret procedures by analogy, that is, it was using the dismissal procedures [of the federal state secrets privilege] to justify [dismissal], after balancing under [Evidence Code section] 1040."

affecting the nation's defense capabilities (*United States* v. *Reynolds* (1953) 345 U.S. 1, 6-7 [97 L.Ed. 727, 732-733, 73 S.Ct. 528, 32 A.L.R.2d 382]), intelligence gathering methods or capabilities (see *Halkin* v. *Helms* [*Halkin II*] (D.C. Cir. 1982) 690 F.2d 977, 993; *Halkin* v. *Helms* [*Halkin I*] (D.C. Cir. 1978) 598 F.2d 1, 8-9), and diplomatic relations with foreign governments. (See *Halkin II, supra,* 690 F.2d at pp. 990, fn. 53, 993; *Republic of China* v. *National Union Fire Insurance Co.* (D.Md. 1956) 142 F.Supp. 551, 556.)

■ The state secrets privilege cannot be asserted by a local governmental entity; it is clear that the privilege "may be asserted only by the [federal] government itself; neither a private party nor an individual official may seek its aid. [Fn. omitted.]" (*Ellsberg* v. *Mitchell, supra,* 709 F.2d at p. 56.) We stress that the federal government has not intervened in this action to assert the state secrets privilege; the privilege was raised only by the City.

■ In order to invoke the state secrets privilege, there must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer. (*United States* v. *Reynolds, supra,* 345 U.S. at pp. 7-8 [97 L.Ed. at pp. 732-733]; *Halkin* v. *Helms* [*Halkin II*], *supra,* 690 F.2d at p. 991; *Kinoy* v. *Mitchell* (S.D.N.Y. 1975) 67 F.R.D. 1, 8-10.) The requirement that a responsible officer assert the state secrets claim "is to assure that the privilege, which in any event is waivable, is not lightly claimed. Hence, the requirement is that the claim be made by someone in a position of sufficient authority and responsibility to weigh prudently the competing considerations of making evidence available in litigation and protecting important government interests. The decision involves policy, not simple law . . . . [T]he decision is a matter of importance and not merely routine categorization of documents, and therefore should be made by a policy-maker who can be assumed to have the larger public interest in mind." (*United States* v. *Am. Tel. & Tel. Co.* (D.D.C. 1979) 86 F.R.D. 603, 605.)

■ Once properly raised, the state secrets privilege is not subject to a weighing of the necessity for preserving the confidentiality of the information against the necessity for disclosure in the interest of justice. "When properly invoked, the state secrets privilege is absolute. No competing public or private interest can be advanced to compel disclosure of information found to be protected by a claim of privilege. [Fn. omitted.]" (*Ellsberg* v. *Mitchell, supra,* 709 F.2d at p. 57; see *United States* v. *Reynolds, supra,* 345 U.S. at

p. 11 [97 L.Ed. at pp. 734- 735]; *Halkin II, supra,* 690 F.2d at p. 990; *Halkin I, supra,* 598 F.2d at P. 7; *Kinoy* v. *Mitchell, supra,* 67 F.R.D. at p. 9.)[17]

■ The showing of necessity for the information claimed to be privileged is the determining factor for "how far the court should probe in satisfying itself that the occasion for invoking the privilege is appropriate. Where there is a strong showing of necessity, the claim of privilege should not be lightly accepted, but even the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake. *A fortiori,* where necessity is dubious, a formal claim of privilege . . . . will have to prevail. [Fn. omitted.]" (*United States* v. *Reynolds, supra,* 345 U.S. at p. 11 [97 L.Ed. at p. 735].)

■ Because of the broad sweep of the state secrets privilege, the Supreme Court has made clear that " '[i]t is not to be lightly invoked.'[29] Thus, the privilege may not be used to shield any material not strictly necessary to prevent injury to national security; and, whenever possible, sensitive information must be disentangled from nonsensitive information to allow for the release of the latter.[30]" (*Ellsberg* v. *Mitchell, supra,* 709 F.2d at p. 57.) "The potency of the state secrets privilege is such that it ought not to be granted except in cases of a palpable threat to national security just as the more exceptional powers of the executive ought not to be used except in cases of grave peril. [Citation.]" (*United States Steel Corp.* v. *United States* (Ct. Int. Trade 1983) 578 F.Supp. 409, 413.)

■ Although the state secrets privilege is absolute once successfully invoked, it does not require the blanket dismissals of all actions. "Once the state secrets privilege has been properly invoked, the district court must consider whether and how the case may proceed in light of the privilege. The court may fashion appropriate procedures to protect against disclosure. [Citations.] Only when no amount of effort and care on the part of the court and the parties will safeguard privileged material is dismissal warranted. [Fn.

---

[17]The other federal governmental privileges (e.g., confidential communications between the President and his close advisors (*United States* v. *Nixon* (1974) 418 U.S. 683, 703-713 [41 L.Ed.2d 1039, 1061-1067, 94 S.Ct. 3090]), information pertaining to ongoing criminal investigations (*Timken Roller Bearing Company* v. *United States* (N.D. Ohio 1964) 38 F.R.D. 57), the deliberative and decisionmaking processes of governmental officials (*Carl Zeiss Stiftung* v. *V.E.B. Carl Zeiss, Jena* (D.D.C. 1966) 40 F.R.D. 318, 324), are qualified rather than absolute: "They may be overcome by a litigant's showing of necessity for the requested information where the litigant's needs outweigh the governmental interest favoring secrecy. [Citations.]" (*National Lawyers Guild* v. *Attorney General, supra,* 96 F.R.D. at p. 396, fn. 10.)

[29]"*United States* v. *Reynolds,* 345 U.S. at 7, 73 S.Ct. at 531; accord *Halkin II,* 690 F.2d at 990."

[30]"See *Jabara* v. *Kelley,* 75 F.R.D. at 492; 2 D. Louisell & C. Mueller, Federal Evidence § 226, at 709."

omitted.]" (*Fitzgerald* v. *Penthouse Intern., Ltd.* (4th Cir. 1985) 776 F.2d 1236, 1243-1244.)

The dismissal of an action to prevent threatened disclosure of a state secret is such a drastic remedy that it has been rarely invoked. (*Id.,* at p. 1242.) Dismissals have been upheld when the "military secrets will be so central to the subject matter of the litigation that any attempt to proceed will threaten disclosure of the privileged matters." (*Id.,* at pp. 1241-1242.)

## 2. *Inapplicability of State Secrets Privilege to the Case at Bench*

In *Totten* v. *United States, supra,* 92 U.S. 105, the estate of a deceased government agent brought suit seeking compensation under an alleged contract with President Lincoln whereby the decedent had allegedly infiltrated the Confederate Army and transmitted reports to the President. The court dismissed the action on the ground that its maintenance would necessarily disclose the existence of a contract that was intended to be kept secret, and the "secrecy which such contracts impose precludes any action for their enforcement." (*Id.,* at p. 107 [23 L.Ed. at p. 605].) The court further stated: "It may be stated, as a general principle, that public policy forbids the maintenance of any suit in a court of justice, the trial of which would inevitably lead to the disclosure of matters which the law itself regards as confidential, and respecting which it will not allow the confidence to be violated. On this principle, suits cannot be maintained which would require a disclosure of the confidences of the confessional, or those between husband and wife, or of communications by a client to his counsel for professional advice, or of a patient to his physician for similar purpose. Much greater reason exists for the application of the principle to cases of contract for secret services with the government, as the existence of a contract of that kind is itself a fact not to be disclosed." (*Id.,* at p. 107 [23 L.Ed. at p. 605].)

Other courts have since relied on *Totten* to dismiss complaints where the maintenance of the actions would inevitably lead to the disclosure of secret information. In *Sigler* v. *LeVan, supra,* 485 F.Supp. 185, the family of a deceased counterintelligence agent, who died following seizure of his memoirs from his home by military and civilian intelligence officers, filed suit against military and nonmilitary intelligence officers seeking damages and injunctive relief in the form of the return of the materials that were seized. The federal government asserted the state secrets privilege with respect to the seized materials. The trial court upheld the privilege and dismissed the injunctive relief claim, stating that disclosure of the materials would "unquestionably damage our national security." (*Id.,* at p. 194.)

In *Salisbury* v. *United States, supra,* 690 F.2d 966, a New York Times editor learned through Freedom of Information Act requests that the CIA and FBI maintained records on him that had been provided by the National Security Agency (NSA). The NSA denied Salisbury's Freedom of Information Act request for those records, indicating that the records were comprised of intercepted foreign communications. Salisbury, reasoning that at least some of those intercepted communications were his communications, filed an administrative action under the federal Tort Claims Act for First and Fourth Amendment claims and privacy violation claims and sought an injunction against further interception. Upon exhausting his administrative remedies, he filed a Freedom of Information Act and Tort Claims Act suit against the government. The NSA defended its refusal to release the records on the ground that revealing the fact of interception would jeopardize intelligence collection methods by disclosing the circuits it actually monitored. The trial court issued orders upholding the NSA's refusal of Salisbury's Freedom of Information Act request, and dismissed the tort action on the ground that "further litigation 'would reveal highly classified information to the detriment of the nation's security interests.' " (*Id.,* at p. 970.) Summary judgment for the NSA on the Freedom of Information Act claim was affirmed on appeal, and the dismissal of plaintiff's claim for damages and equitable relief was also affirmed. The appellate court refused to impose sanctions against the government for its assertion of the state secrets privilege by either entering a finding in favor of Salisbury on the allegations of interception, or by inferring interception. Since Salisbury could not prove the interception without the documents, the dismissal of his claims for damages and equitable relief were affirmed. (See also, *Halkin* v. *Helms* [*Halkin I*], *supra,* 598 F.2d 1 ; and *Halkin* v. *Helms* [*Halkin II*], *supra,* 690 F .2d 977, which both also involve dismissals due to the plaintiffs' inability to prove interception of communications without access to the privileged documents.)

In this case, plaintiffs have repeatedly asserted their ability to proceed to trial even if they are precluded from conducting any discovery. Should this case reach a trial, it is conceivable that plaintiffs may be able to prove their allegations that the alleged surveillance exceeded the limits of proper police investigative work, without benefit of discovering any information from defendants. Through the independent testimony of JDL members, a "hearing may establish that some of the alleged informer and infiltration activities are unrelated to legitimate law enforcement functions . . . ." (*Handschu* v. *Special Services Division* (S.D.N.Y. 1972) 349 F.Supp. 766, 771.) Therefore, this case is distinguishable from the *Totten* line of cases discussed above, even if they were applicable, in that plaintiffs can proceed without the use of any evidence that defendants claim is privileged.

Plaintiffs have represented in their reply brief on this appeal that they are not challenging the propriety of the decision to infiltrate the JDL: "Appellants have *not* challenged the LAPD's right to surveil or even infiltrate the JDL in this lawsuit. The gravamen of Appellants' claims is that the LAPD went beyond the scope of legitimate surveillance on infiltration of the JDL, *inter alia,* by inciting the JDL to violence and by taking other actions designed to destroy the group's legitimate First Amendment activities." ██ █ Plaintiffs claim they can prove, without access to any secret information in defendants' possession, that Winston was an LAPD officer who, in the course of duty, exceeded legitimate law enforcement functions while infiltrating the JDL.[18]

The elimination of the issue of the propriety of infiltrating the JDL appears to remove any concern that defendants would be handicapped in their defense by being unable to introduce secret information in order to justify the infiltration. Defendants nevertheless contend that the complaint must be dismissed because they cannot conduct a defense or even cross-examine witnesses without revealing national, state and local security secrets, including whether or not the LAPD infiltrated the JDL. Using a hypothetical situation involving the lawful infiltration of a group involved in unlawful and perhaps terrorist conduct, the deputy city attorney representing defendants on this appeal explained at oral argument that disclosing the fact of surveillance could jeopardize security interests by inducing a group to go underground, to move its location, and to take other steps to avoid further detection. She further explained that admitting that there was no surveillance could jeopardize security interests by revealing the authorities' lack of knowledge of the group, thus encouraging it to operate with free reign.

---

[18]The use of informants for surveillance purposes is not violative of the Fourth Amendment, absent some sort of harassment or incitement to crime. (*Ghandi* v. *Police Dept. of City of Detroit* (6th Cir. 1984) 747 F.2d 338, 347.) In *Laird* v. *Tatum* (1972) 408 U.S. 1 [33 L.Ed.2d 154, 92 S.Ct. 2318], "the plaintiffs had alleged that the mere existence of an Army surveillance system which investigated lawful and peaceful civilian activity chilled the exercise of their [F]irst [A]mendment rights. The Supreme Court held, in a 5-4 decision, that 'in the absence of a showing of objective harm or a specific threatened future harm,' any claimed chill is merely 'subjective' and therefore not justiciable." (*Alliance to End Repression* v. *City of Chicago* (N.D.Ill. 1985) 627 F.Supp. 1044, 1047.)

"The use of secret informers or undercover agents is a legitimate and proper practice of law enforcement and justified in the public interest—indeed, without the use of such agents many crimes would go unpunished and wrongdoers escape prosecution. It is a technique that has frequently been used to prevent serious crimes of a cataclysmic nature. The use of informers and infiltrators by itself does not give rise to any claim of violation of constitutional rights. However, those so engaged may not overstep constitutional bounds; the Bill of Rights protects individuals against excesses and abuses in such activities. Also, while those bent upon crime may be afforded the opportunity to carry through their illicit purpose, the initiation and inducement of criminal activity by government agents is proscribed. [Fns. omitted.]" (*Handschu* v. *Special Services Division, supra,* 349 F.Supp. at pp. 769-770.)

We find this perceived threat to national, state and local security interests, *despite the proposed elimination of all discovery* [19] *and the elimination of any issue concerning the propriety of the decision to infiltrate,* to be too tenuous to justify the dismissal of plaintiffs' action even under the *Totten* line of cases, if applicable.

The en banc decision of the Fourth Circuit in *Farnsworth Cannon, Inc.* v. *Grimes* (1980) 635 F.2d 268 , does not persuade us to reach a contrary result. In *Farnsworth Cannon,* the United States asserted a claim of privilege for state secrets in an action between private parties for allegedly tortious interference with reasonably expected future contract rights. The claim of privilege was raised through an affidavit submitted by the Secretary of the Navy and examined by the district judge in camera. The parties were unaware of the contents of the affidavit. The trial court dismissed the complaint upon a finding that the plaintiff could not make out a prima facie case of tortious interference without resort to the information within the excluded state secrets. The appellate court affirmed, stating: "That affidavit has not been seen by counsel, and without some disclosure of the affidavit to counsel, the trial lawyers would remain unaware of the scope of exclusion of information determined to be state secrets. Information within the possession of the parties on the periphery of the suppression order would not readily be recognized by counsel, unaware of the specific contents of the affidavit, as being secret or as clearly having been suppressed by the general order of the district court. In an attempt to make out a prima facie case during an actual trial, the plaintiff and its lawyers would have every incentive to probe as close to the core secrets as the trial judge would permit. Such probing in open court would inevitably be revealing. It is evident that any attempt on the part of the plaintiff to establish a prima facie case would so threaten disclosure of state secrets that the overriding interest of the United States and the preservation of its state secrets precludes any further attempt to pursue this litigation." (*Id.,* at p. 281.)

The *Farnsworth Cannon* decision presents the one exception to the uniform federal rule that, "when the government is a defendant in a civil suit, its invocation of the privilege results in no alteration of pertinent substantive or procedural rules; the effect is the same, in other words, as if the government were not involved in the controversy. [Fn. omitted.]" (*Ellsberg* v. *Mitchell, supra,* 709 F.2d at p. 64.) As the *Ellsberg* court stated: "Outside of this one special context [*Farnsworth Cannon*], however, the uniform rule governing civil suits brought by private parties is that the effect

---

[19]We do not imply that plaintiffs have waived the right to conduct discovery; our reference is to the alternative urged by plaintiffs below in the face of a dismissal.

of invocation of a state secrets privilege is simply to remove from the case the material in question." (*Id.,* at p. 65.)

We refuse to follow the exception to the rule because this case is distinguishable from *Farnsworth Cannon.* Here, the plaintiffs do not have any secret information in their possession that they could unwittingly disclose in an attempt to prove a prima facie case. We therefore conclude that the dismissal was improper under federal law.

### 3. *Section 1040, a Mere Exclusionary Rule, Is Not a Dismissal Statute*

Given our determination that the federal state secrets privilege is inapplicable herein, the sole remaining possibly applicable evidentiary privilege is the state privilege for official information. (Evid. Code, § 1040.)[20] Under California law, "Section 1040 of the Evidence Code 'represents *the exclusive means* by which a public entity may assert a claim of governmental privilege based on the necessity for secrecy.' [Citation.]" (*Shepherd* v. *Superior Court, supra,* 17 Cal.3d at p. 123.) (Italics in original, fn. omitted.) Section 1040, however, does not allow the dismissal of a civil action based on a threatened disclosure of local state secrets. By its terms, section 1040 only allows for the exclusion of the privileged official information; it does not provide for the dismissal of an action brought by a private party. Moreover, as will be explained in the following section, it is evident that the trial court failed to properly apply section 1040 to this case.

We can therefore find no statutory or judicial authority for the dismissal of this action under either state or federal law. We think that the deputy city attorney recognized the extreme nature of the City's position in her comments made during oral argument: ". . . . I do not . . . wish this court to think that the Los Angeles Police Department or the City of Los Angeles would ever consider this to be a defense that we would assert each and every time that any individual brings a First Amendment claim . . . . If in fact we came in each and every time a claim was filed, and we tried to argue this before this court or a trial court, I think it would probably be appropriate that some court take strict action against it, particularly given the First

---

[20]"A public entity has a privilege for nondisclosure of the identity of a *confidential* informer that is somewhat similar to the privilege for nondisclosure of official information. Under Evid C[ode] § 1041, the privilege applies only to the identity of an informer who provides confidential information as to a law violation to (1) a law-enforcement officer, (2) an administrative agency charged with administration or enforcement of the law alleged to be violated, or (3) some other person, for transmittal of the information to a law-enforcement officer or an appropriate administrative agency." (2 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) Privilege for Identity of Informer, § 43.1, p. 1543.)

Amendment rights. But in this case, at this time, under these facts, we felt it appropriate to make that request of the court understanding the unusual nature of it, understanding the implications of it to the court system. Again I think this is something that this City would request perhaps once in all of our lifetimes . . . ."

Our judicial role necessarily requires us to maintain a broader vision than that of the individual litigants who come before us. Under our legal system's policies of stare decisis and judicial restraint, we cannot, on the basis of the record before us, accede to the City's request to create a new means of achieving the drastic remedy of dismissal without any justification under statutory or decisional law. "We dare not forget Justice Frankfurter's warning that the history of procedure is 'the history of American freedom.' (*In re Gault* (1967) 387 U.S. 1, 21 [18 L.Ed.2d 527, 542, 87 S.Ct. 1428].)" (*Hochheiser* v. *Superior Court* (1984) 161 Cal.App.3d 777, 785 [208 Cal.Rptr. 273].) Having determined that there is no basis under federal or state law to dismiss this action, we conclude that the trial court abused its discretion in granting defendants' motion to dismiss under Code of Civil Procedure section 597.

C. *The Motion to Compel Responses to Interrogatories Was Improperly Denied*

Under California law, "Section 1040 of the Evidence Code . . . essentially establishes two different privileges—an absolute privilege if disclosure is forbidden by a federal or state statute (subd. (b)(1)), and a conditional privilege in all other cases pursuant to which privilege attaches when the court determines, in accordance with precise statutory standards, that disclosure is against the public interest (subd. (b)(2)). [Fns. omitted.]" (*Shepherd* v. *Superior Court, supra,* 17 Cal.3d at p. 123.) (Italics in original.)

Evidence Code section 1040 provides: "(a) As used in this section, 'official information' means information acquired in confidence by a public employee in the course of his or her duty and not open, or officially disclosed, to the public prior to the time the claim of privilege is made.

"(b) A public entity has a privilege to refuse to disclose official information, and to prevent another from disclosing official information, if the privilege is claimed by a person authorized by the public entity to do so and:

"(1) Disclosure is forbidden by an act of the Congress of the United States or a statute of this state; or

"(2) Disclosure of the information is against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interest of justice; but no privilege may be claimed under this paragraph if any person authorized to do so has consented that the information be disclosed in the proceeding. In determining whether disclosure of the information is against the public interest, the interest of the public entity as a party in the outcome of the proceeding may not be considered."

 There is no claim here that the absolute privilege of section 1040, subdivision (b)(1) applies; we know of no federal or state statute that forbids disclosure of the information sought to be protected herein. Although defendants refer in their brief to the California Public Records Act (Gov. Code, §§ 6250-6260), it is clear that those provisions "cannot serve as a basis of absolute privilege under Evidence Code section 1040, subdivision (b)(1) . . . ." (*Shepherd* v. *Superior Court, supra,* 17 Cal.3d at p. 124.) Government Code section 6254 provides that "nothing *in this chapter* shall be construed to *require* disclosure of records that are: . . . [¶] (f) Records of complaints to or investigations conducted by, or records of intelligence information or security procedures of, . . . any state or local police agency, or any such investigatory or security files compiled by any other state or local police agency, or any such investigatory or security files compiled by any other state or local agency for correctional, law enforcement, or licensing purposes . . . ." (Italics added.) As stated in *Shepherd*: "It is manifest, however that the effect of section 6254 is limited to 'this chapter' (i.e. the California Public Records Act, dealing with public inspection of certain governmental documents) and has no application to any procedure not under that act. Moreover, section 6260, the final provision of the act, specifically provides that '[t]he provisions of this chapter shall not be deemed in any manner to affect . . . the rights of litigants, including parties to administrative proceedings, under the laws of discovery of this state.' " (17 Cal.3d at pp. 123-124.)

 Thus, the only privilege possibly applicable to this case is the conditional official information privilege of Evidence Code section 1040, subdivision (b)(2). *Shepherd* v. *Superior Court, supra,* 17 Cal.3d 107 , set forth the basic elements of the conditional official information privilege of Evidence Code section 1040, subdivision (b)(2). Although *Shepherd* involved a subpoena duces tecum (Code Civ. Proc., § 1985), we see no reason why its principles should not be equally applicable to this case.

 The principles are these: "First, the trial court should undertake to determine, without respect to possible privilege, whether and to what extent the moving papers are in compliance with the requirements of specificity,

materiality, and good cause set forth in section 1985 of the Code of Civil Procedure. Second, with respect to each of the items sought which meet with those requirements the trial court should determine whether it comprehends 'information acquired in confidence' which may be subject to the privilege for official information set forth in section 1040 of the Evidence Code; items which qualify for production under the standards of section 1985 but which do not consist of 'information acquired in confidence' should be ordered to be produced. Third, with respect to items which qualify for production under the standards of section 1985 but which consist of 'information acquired in confidence' within the meaning of section 1040 of the Evidence Code, the trial court should proceed to determine whether they qualify for the conditional privilege of subdivision (b)(2) of that section in that their disclosure is against the public interest; all items which do not so qualify should be ordered to be produced." (*Shepherd* v. *Superior Court, supra,* 17 Cal.3d at pp. 127-128.)

 It is evident from our examination of the record that the trial court failed to make the threshold determination of whether the information claimed to be privileged[21] was information "acquired in confidence by a public employee in the course of his or her duty and not open, or officially disclosed, to the public prior to the time the claim of privilege is made." (Evid. Code, § 1040, subd. (a).)

We therefore reverse the order denying the motion to compel responses to interrogatories and remand the case in order for the trial court to reconsider plaintiffs' motion by making the proper factual determinations under Evidence Code section 1040, subdivision (a).

Assuming that the trial court on remand determines that some or all of the requested information constitutes "official information" within the meaning of subdivision (a) of section 1040, the trial court should then proceed to determine whether the information is privileged under subdivision (b)(2). Of course, such a determination will be necessary only as to those interrogatories which the trial court, in the exercise of its sound discretion, deems to be the proper subject of discovery under the requirements of the Code of Civil Procedure.

---

[21]This information includes whether Winston filed an answer in this case, whether Winston is represented by the city attorney's office, whether Winston is an LAPD Officer and a member or past member of its public disorder intelligence division and/or ATD, whether Winston conducted a surveillance of plaintiffs, whether defendants contend that plaintiffs are a violent organization justifying infiltration and surveillance by the LAPD, and whether defendants ever infiltrated the JDL in the past, and if so, the details and the names of the police officers.

In the interest of judicial economy we offer for the guidance of the trial court some comments concerning the proper exercise of discretion in the balancing test contemplated by subdivision (b)(2) of Evidence Code section 1040 and the procedural effect of any suppression of evidence under that section.

Subdivision (b)(2) "requires that the trial court consider, with respect to each item of material found to be discoverable under the provisions of Code of Civil Procedure section 1985, whether there is 'a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interest of justice.' If it decides that question in the affirmative, then '[d]isclosure of the information is against the public interest' and the particular item should be deemed privileged. If it decides that question in the negative, production should be ordered. Such a weighing procedure will entail a separate assessment of the 'necessity for disclosure in the interest of justice' and the 'necessity for preserving the confidentiality [of the subject information].' " (*Shepherd* v. *Superior Court, supra,* 17 Cal.3d at pp. 125-126.)

The complaint states that Winston's alleged infiltration of the JDL began in September 1979 and lasted for three and one-half years. The passage of time since the end of the alleged infiltration is a factor to be considered by the trial court in weighing the need for secrecy against the need for disclosure. In *United States* v. *Ahmad* (3d Cir. 1974) 499 F.2d 851 , it was stated that a federal officer's affidavit claiming the state secrets privilege should be considered in light of the circumstances at the time of the request for disclosure: "[W]hat may have been justified in May of 1971 . . . is not necessarily so today. The passage of time has a profound effect upon such matters, and that which is of utmost sensitivity one day may fade into nothing more than interesting history within weeks or months. Any considerations of national security interests therefore must be viewed in the light of circumstances as they exist at the time the request for disclosure is made—not when the affidavit was prepared or the material filed with the court." (*Id.,* at pp. 854-855.)

D. *The Motion for Protective Order Against Further Discovery Was Improperly Granted*

Based on our review of the record, it appears that the motion for protective order against further discovery was brought in conjunction with the motion to dismiss, in that defendants' sole reference to the protective order in its moving papers simply states: "For these reasons, the City respectfully urges that based upon the foregoing and the court's file in this matter,

this court defer all discovery procedures, and permit the submission of evidence through *in camera* hearings in support of its motion for dismissal."

We infer from defendants' moving papers that the protective order was sought as a means of staying discovery in general until the in camera hearing of the motion to dismiss could be held. We do not think that the parties or the court intended the protective order to be aimed at any specific pending discovery (Code Civ. Proc. § 2019, subd. (b)(1)), and we know of no outstanding discovery requests other than plaintiffs' motion to compel responses to interrogatories.

We conclude therefore that our determination that the motion to dismiss was improperly granted also undermines the basis for the granting of the instant protective order.

## III

### DISPOSITION

The judgment for defendants is reversed. The case is remanded and the trial court is directed to dissolve the instant protective order and to hear plaintiffs' motion to compel responses to interrogatories in accordance with the views expressed in this opinion. The plaintiffs shall recover their costs on appeal.

Johnson, J., and Cole, J.,* concurred.

Respondents' petition for review by the Supreme Court was denied July 2, 1987.

---

*Assigned by the Chairperson of the Judicial Council.